Ace numbers 14-5178 and 14-5179, United States of America v. Mamadou Bah and Allan Harvey, respectively. Oral argument not to exceed 10 minutes for each defendant, 20 minutes for plaintiff. Laura E. Davis, you may proceed for the first appellant. Good morning, Your Honors. Laura Davis for Mamadou Bah. I would ask to reserve three minutes for rebuttal. May it please the Court, digital is different. What we've seen in Riley is that digital information, digital media storage, needs to be treated differently than other media storage or other items. In the case we have before the Court with the credit card, debit card, the mag stripe, though it is a small amount of data on that digital media storage, it is still something in which we have an expectation of privacy that is reasonable. Though we give our cards voluntarily when we choose to make a purchase, we don't expect when pulled over by a police officer for speeding to have them ask for license, registration, and anything containing a mag stripe, which is essentially what they did with Mr. Bah. They arrested him for having an expired driver's license and then rifled his wallet and his car, took everything with a mag stripe, including his own debit card that had his name on it, and that was the only card that had a name on it. Are you challenging taking the card or looking through a decoder at what's on the mag stripe? I'm challenging putting the mag stripe through a decoder. If you accept that what they did was an inventory search... When they took his license, they swiped that in the police car to check his record, didn't they? They ran his driver's license number. I don't know if it had a mag stripe on the back. Not all licenses do, but we have a different... For purposes of discussion, just for fun, let's assume that, one, it did have a mag stripe on it, and let's assume that they did run it, and that's how in this modern age they find out if you've got a warrant outstanding or whatever. What private information is... And let's start in my hypothetical with the question of is there a problem running your driver's license, assuming it has a mag stripe, through the police scanner? We have a different expectation in our driver's licenses, especially in regard to... I got that. So the answer is that that's okay. With law enforcement, yes. Now we've got law enforcement. What information is on the mag stripe in these various cards that are the subject of this case that's not on the mag stripe of the driver's license, if you know? There is the account number. There is the account holder. The account number is on the front of the card. However, the account holder is not necessarily the person on the front of the card. You may remember in the district court opinion on a lobby that the agent who swiped his own card through the mag stripe reader during the evidentiary hearing in that case, while his name was on the front of the card when he swiped it, the card holder was the United States. It was a government credit card. And so you will have situations where the card holder's name is... Hold on just a second. If it's your name on the mag stripe and that matches the name on the front, I mean, obviously you don't have any expectation of privacy on that. It's right on the front. If it's somebody else's name, then how do you have standing to complain about the revealing of their name? Because it's revealing what information I know about that card, that I have a relationship with somebody that would have them take out a credit card in my name, that it's my employer. Seriously, aren't you getting a little far afield here on expectation of privacy? I don't think so, Your Honor. I think that when you... What else other than the holder of the card? Is that the most sensitive thing on there, or is there something else? Typically what you have in a normal situation is the holder of the card, the credit card number, and algorithms for the processing of the card. However, that's not necessarily what the card can hold. You can re-encode. Obviously in this case we had re-encoding with illicit information, but you can re-encode these cards for anything. It's a small amount of data, but you can legitimately buy a scanner and a coder. You can legitimately buy mag stripe cards, or you could take old gift cards and re-code them. What would be the legitimate reason for re-coding a card by an individual versus a credit card company? If you wanted to use them as a security swipe, if you established a door somewhere in your home, or in a club, or anything like that. But not for purchasing of anything, though? You said security. I take it that's separate from purchasing. Correct. But if you're going to do it for that purpose, you're just going to put the electronic equivalent of your name on it so the door knows who you are, and you're authorized to go through the door, right? Well, you could use it for... You don't have any expectation of privacy in your name. You have an expectation of privacy in your right to enter a place, or your membership in a club, where this is your secret membership card. But you also have an expectation of privacy in your financial data. Is our case here what might have been on the cards but weren't on these cards? Is that really what we're worried about, or are we worried about the information on these particular cards? It's on all cards, because if you're just worried about the information particular to these cards, you're not ruling on mag stripe data, you're ruling on the information, rather than the search of the mag stripe by passing it through a machine. Is this a camel's nose in the tent argument? Is that really what we're talking about here? I don't think so. The other issue we have... Before we go to the other issue, I wanted to ask about... Is it Riley? Is that the case that you're relying on? Is that the name of it? Yes. Riley, in part, there are... You've got Riley. To me, you have Riley at one extreme, where there's privacy, and they can't just go through the whole cell phone and see all the tons of stuff that could be on a cell phone. And at the other extreme, you'd probably agree that anything that was printed on the surface of a little card, they could look at if they're entitled to take the card. They can look at the surface if they are entitled to have the card, yes. But we're assuming, for purposes of this argument, that they are entitled to have the card. But you just wonder where to draw the line. I mean, what if the type on the front of the card is small? Or what if it's in Braille? I mean, you would still think that a police person could look at it, and that really what was going on in Riley was the vast scope of information that could be put on a cell phone. So if we're looking at this in sort of realistic terms, which is the whole idea of Riley is, you know, sure, it's all on this little thing, but it's actually a huge amount of stuff that's on this little thing. That's basically, to me, what's going on. So if we're looking realistically at a mag stripe, there's not that much that you could put on there. It's more or less equivalent to what you could type on there, especially if you typed small. I'm having a hard time seeing why we should arbitrarily categorize anything that's magnetic as being the same as a voluminous amount of information when we happen to know that this particular magnetic amount of information is not voluminous. Do you see my question? I do. You have worry, which is a companion case to Riley, where they had a flip phone. It was not a smartphone. It had a smaller amount of data. And all they used it for, they pressed two buttons to find out what phone number was associated with the tag My Home. There have been cases since then. There's Ruiz... There's potentially all kinds of other stuff they could have put. That's like saying,  because you only had a few words in the letter. Sure, you have to say mail is... You either have an expectation with respect to mail or not. But other things... A postcard, you don't have an expectation, and you can look at it, even though you could probably write real small on the postcard. I'm not seeing why this isn't more like the postcard than the letter. Partly because of the evolving technology. Well, if it evolves differently, you can distinguish the case, I think. If you start having MagCards that have encyclopedias on them, that's going to be different. Well, we are about to have MagCards that have the computer chip that changes it with every transaction. That's not what we're talking about here, though, right? But if you draw a line... The information on those new cards, the whole point of it is it's useless to anybody. So, who cares? It works for one transaction when you buy something in a store and the number can't be used again by anybody for anything. That's the whole point of the new technology. So, what's the expectation of privacy in that one number for one purchase that can't be used again? Because there's still other information. You still have cardholder information. You have, for instance, with the agent, the agent's name on the front of the card, the United States on the back. That doesn't have anything to do with the new technology you're mentioning. Well, we don't know what all is going to be put on the chip. But the thing with the MagStripe is there could be more. How about if we look at it this way? I mean, I can see maybe that somebody could choose to put their whole life on some sort of card if they're available, and maybe we should treat that like a computer or a phone. I don't know. But these aren't those cards. These are gift cards that are designed to be taken to a store. So why would anybody assume there was an expectation of privacy in the information on the MagStripe, whatever it was, in connection with this type of a card that your client, fortunately or unfortunately in his case, chose to use? The other information that could be on the card is the amount of money on the card, if it is one where you code in, you load the card. Gift cards or credit cards? I guess I was confused. Or both? Both. There's a mix of cards recovered, and at the hearing they refer to them interchangeably. So the amount of money available on the card is also private in your estimation? It is. If you're walking down the street, a police officer should not be able to come up to you and say, excuse me, you need to tell me how much money you have in your bank account. How is the gift card inculpatory information? I mean, I could see how a credit card with one name on the front and another name on the back was a problem, but I'm just curious as to why gift cards got to be an issue in this case. If I'm an unemployed, suspected drug dealer and I have a gift card with me that has $3,000 on it? It's just like the amount of cash? Yes. Is that what it was used for? Okay. Thank you. That was just an informational question. I see your time is up. Do you have a question? Yes. Thank you. Thank you, Counsel. Hello. My name is Jonathan Cave. I represent the appellant, Alan Harvey. I ask to reserve three minutes for rebuttal. I hate to push myself into it, but we've also joined to argue that the magnetic stripe is also a search. There's just one additional thing that I wanted to add. The district court case of Aliaba, the New Mexico case, one of the things they pointed out was the Supreme Court had not yet suggested that a virtual intrusion as opposed to a physical invasion has met a trespass analysis. Within Riley v. California, they specifically point out and compare the case to United States v. Jones, a 2012 case regarding a GPS monitor being put onto a vehicle, saying that this trespass analysis would apply. We argue when you manipulate the data, similar to United States v. Hicks, Arizona v. Hicks, where they moved a stereo to look at a serial number, if you were required to manipulate the data in any way, then there is a trespass, there is a search, and that's the difference to make the swipe of the mag stripe to get that information is how it's now a trespass, it's become a search. Trespass view is a magnifying glass on small print? It's not the same as a magnifying glass. That's assuming the information on the front is the same as the information at the back. During the district court hearing... How does that answer my question? That's not a trespass, right? If you're not manipulating the data, you're only looking at... If you're not manipulating the data, it makes it bigger. But the district court already... You already know, I guess. You're saying that's not a trespass. I think using a magnifying... Of course, then again, using a telescope into someone's window may be, but I guess it depends on... A magnifying glass on the card would not... On the card, yeah, you've got, you know, some print, they could put... We're talking about the amount of information. Right. A lot of information in small print can use a magnifying glass, or is that under your rationale, a trespass? I wouldn't think it would be because it doesn't require manipulation. Why is that not manipulation? You're manipulating it to make it bigger. You're magnifying it. You're taking something little and manipulating it into something big. Well, I guess... Or do I misunderstand the word? I guess it would be the same as having to move the stereo. You have to move to look at it if the card is there and you're just looking at it. How do you get swiping a card and using a reader to be manipulation? I guess it depends on how you define manipulation. You're not changing anything, you're just... By manipulation, I mean just moving. How is it even moving? There are ones and zeros that are stored magnetically, however they do that, on these cards. You're not moving them. You're just having the reader tell you what those ones and zeros are, and then through the marvel of electronics, the reader then tells you what that means, what the sequencing of those ones and zeros are. That's all it is. But to get into it is requiring to take the physical card, to move it through a specific device in order to get the information. It's not just taking the card and looking at it. Advice. How about if they keep the card firm and swipe the reader over it? Would that be okay? I guess we're still getting... It's so much fun when I amuse my colleague here. It takes a long time, but eventually... We would still be getting to the... We waited all week for a hypothetical like that. It's just fun. We're still getting to the point that these cards weren't voluntarily brought over. They seized the cards, and yet then they're doing additional actions in order to get additional information from the cards. I can see if somehow you had to use a little razor knife and you cut into the middle of the card, and that's how you got to see these ones and zeros, but they're just there stored electronically on this stripe. You're not taking them out. You're not removing them. You're not moving them around on the card. They're there. They're there before you did it. They're there after you did it. They didn't change. I don't see how that's manipulation, even assuming that that word manipulation has something to do with the test. It's invisible to the naked eye, similar to the serial number on the back of the speaker. He couldn't see it until he had to take the object and adjust it in some way in order to get to it. In this case, you're having to swipe the mag stripe, and that's where I would argue there's an equivalence. Is that your best argument? Or is this just an extra one? It's an extra argument, but my best argument would be that the trespass is when they take a card and do anything additional to it, whether it's swiping it, whether it's buying it. If you want to get more information out of it that's not visible, not in plain view, you have to get a search warrant. What do you say is the most private of the information that's on the back of one of these type of cards, not some other hypothetical card, that you're most worried about? How much money is on the card? Not only would you know where they're shopping, you know how much money they're spending. That data in compilation, you can learn a lot about an individual, about where they're spending their money and how much they're spending. Let's talk about the money for a second. You stop somebody and assume that you become in lawful possession of their wallet. It wouldn't be unusual in these cases. You open the wallet up, and it's got money in it. Do you have a reasonable expectation in the privacy of the inside of your wallet because it'll show how much money you're carrying, i.e., you're the unemployed drug dealer that Ms. Davis used as the hypothetical and you've got $10,000 of cash in your wallet or in your sock or in your money clip? Why isn't that the same as the amount of money that's electronically shown on the back of these cards? First, if it was just found on the street, it would be a little different than the officer just taking the wallet. But in addition to that, not only— We're assuming in all of our discussion here that the officer is in lawful possession of whatever it is we're talking about, a card, a wallet, a sock, a money clip. Okay. They would still be able to find out the additional information of where this money is being spent, and also they would be able to know because generally on the front of the card— Okay, so I got you off the fact that there's an amount of money because police find amounts, quantities of money on people they're investigating all the time. Yes. So it can't just be the amount of money. But where it's being spent as well. With a gift card— There's no indication in this record that I am aware of that where the money that's on the card that could be spent if they took it to a store is being spent. That's not stored on these cards. Just the amount of money as you use it, the amount of money goes down. You start it with $1,000, it goes down. But what you just said I don't think is supported by the records, so correct me if I'm wrong. Well, I am speaking in general regarding a gift card. A gift card from a particular store, you'd know where they're spending their money. Well, we'd know that from the face of the card. It says sacks on the front of the card. Right. So that's not private. But how much is being spent is. That's sacks. Yes. So the difference in my wallet example is you know that it started at $1,000 and now it's down to $700. In my wallet example, you know it's $10,000 and you don't know what it started with? And that's what you're worried about? But even then, a gift card can still be recharged. Wow. So? I guess it's information that could be used to learn the habits of a particular individual of how they spend their money, where they go, how they go about their business. You could learn much more information from somebody through their gift cards than you could just through cash and a wallet. And credit cards. And the service of credit cards. Correct. Okay. Your time is just about up. Can I take you to a different subject for a moment? I assume you were going to get to the cell phone issue as well? Is that part of your plan? Yes, and also I was going to get to United States versus Rodriguez. Well, there's a question on my mind. Maybe you and your opposing counsel can clear it up for me. We have essentially, as I read the facts, two searches. First, by the local authorities that is conceitedly in violation of Riley. And then we have the warrant sought by the Secret Service that did not reference anything from the initial search. My question to you is, was there anything after the second search that you contend was taken in violation of the Fourth Amendment through the prior search? That's what I can't seem to get from the record here. Well, I guess my argument was regarding the search. I guess they're saying that the taint has been cleared because they subsequently obtained the search warrant even after they had obtained the photos against Riley versus California. My argument is that I believe it was Davis versus the United States from the Supreme Court in 2011. They stated, evidence obtained during the search conducted in reasonable reliance on binding precedent is not subject to exclusionary rule. There certainly was no binding precedent here. I'm assuming, let's just for the sake of argument, assume that the first search violated Riley. And I'm not even looking at the Leon exception. You would still have to show that as a result of that search some evidence was improperly or illegally used. Since we have a second search pursuant to a search warrant, is there anything from the first search that either influenced the second search warrant or was illegally used at trial? That's what I'm looking for. None of it was used at trial against our clients. He's asking was there a taint in connection with the second search obtained through a warrant by virtue of what they illegally got the first time, I think. Just a taint question. United States versus Leon states on page 990. Leon is a good faith case. This is not a good faith question. It's a taint. Was what the government claims to be the second lawful search tainted by the illegal first search? Yes. Even though they didn't put what they found in the first search in the affidavit, which is what the government argues, was it still tainted because they wouldn't have been able to do what they did the second time had they not illegally done it the first time? My argument is that they were dishonest in their affidavit because they didn't provide all the facts to the judge. What facts didn't they provide that tainted the probable cause determination by the judge in the second warrant? The purpose of suppression wouldn't be regarding the judge and the judge providing an inappropriate warrant. It is the inappropriate actions of the officer. If the information obtained subsequently after the illegal actions of the officers is allowed, the evidence is allowed to be admissible, it would be the equivalent of the officers coming in, breaking into a home, all of a sudden realizing there's some great evidence here, then trying to remedy it by saying, not mentioning anything about breaking into the home or anything like that, remembering they do have some evidence that could get them a good search warrant, and then relieving the taint of their bad actions by subsequently obtaining a search warrant. If they didn't relay any of that information in obtaining the search warrant? They did not. They left out... In your hypothetical, even if... Even if... And I argue that they can't then save their poor behavior by subsequently obtaining a proper search warrant. I guess that's the question. Why not? Well, U.S. v. Leon, they say that suppression is appropriate. They argued officers were dishonest in preparing their affidavit. And I argue... That they actually said something not true about whether there was additional evidence? I argue they were dishonest in what they left out. And that's the reason why I'm giving that example. If they're supposed to leave it out, how can it be dishonest in leaving it out? And if they have some information that was wrongfully obtained, so they don't want to use it, but they want to get into the house and, yeah, they know the stuff's there. I understand that. But the person who's issuing the warrant presumably doesn't know that the stuff is there. If he does, I can see there's a real problem. But if he doesn't, I don't... He or she, the magistrate, doesn't know. It seems like the worst thing for the police to do is tell the magistrate what... You shouldn't be telling the magistrate the stuff that you got invalidly, but rather not to tell him that. How is that dishonest? It seems to me that's the honest thing. I'm trying to take it to an extreme to show how far it can go. But in the extreme example, I'm just not understanding it. I think what you're arguing is that they were required to say that we illegally looked at what was on a cell phone. Yes. But to answer Judge Rogers, you wouldn't have them say what they saw on that because that is going to taint then presumably the magistrate's finding. So there's some salutary purpose here in connection with the second warrant, the warrant to say, hey, we looked at a cell phone and we shouldn't, but don't tell them what it is? That's the argument you're making? The argument is... That's the dishonesty. The dishonesty is the equivalent of them... They've already broken into the home. They've already looked at the evidence. Then they come out. Then they think of, well, what particular items can we use to build a good case for probable cause to get a search warrant here? The bad act has already occurred that requires the exclusion. Isn't your better argument that there's not a requirement that every investigative resource be used before a warrant's sought, but when one is sought, the magistrate judge ought to have all the information? Yes, Your Honor. Thank you, Counsel. Thank you. May it please the Court. Suzanne Kearney Quillen for the United States. In this case, Your Honors, the defendant's conviction should be affirmed because, number one, Defendant Harvey was detained for a reasonable period of time. Number two, a lawful inventory was conducted of Defendant Baugh's vehicle, which led to the discovery of the evidence at issue in this case. Number three, the evidence obtained from the cell phone seized during the inventory should not be suppressed as a lawful search warrant was ultimately obtained. And number four, there is no reasonable expectation of privacy in the limited data contained on a mag stripe of the debit cards and credit cards which were obtained in this case. Your opposing counsel in their oral arguments just addressed three and four, so unless my colleagues have questions with respect to one and two, why don't you proceed to three and four. I will. Thank you, Your Honor. With regards to issue number three, the initial search of the damaged BlackBerry must be deemed unconstitutional in light of the Supreme Court's recent decision of Riley and Worry, but suppression in this case is still not the appropriate remedy as the cell phones were ultimately pursued to a lawfully obtained search warrant. Can I go back to what we were just talking about a moment ago? Yes. In the government's view, was there any evidence from the first search that was either used to obtain the second search or otherwise used anywhere else in this case? It was not, Your Honor. There was nothing in the search warrant affidavit that referenced the first search of the damaged BlackBerry by the officers. In addition, there was nothing from that first search that was ultimately used in the prosecution of the defendants. It was not referenced. Nothing from the first search that made its way indirectly or through to the forbidden tree, any of the sort of other tangential ways into the affidavit for the search warrant? It did not. The affidavit of the search warrant was limited to only the information from the scan of the mag stripes of the credit cards. It would caught my attention here. I read the affidavit the same way you do. I didn't see anything that related back to the initial search, but I was a little troubled that the magistrate judge wasn't told, not what was found, but just the full story of how the search warrant affidavit and application came to be presented with a pretty important fact missing, it seemed to me. Well, Your Honor, at the time that this search warrant was obtained, the Raleigh and Wherry opinions had not been decided, and there was no legal precedent in the United States. I understand that's the first search, but in the affidavit I would typically expect that all information known to the agent at the time, I understand why you wouldn't put in what came from what the agent believed might be a questionable search. Now we know it was, leaving that out. But the fact of the prior search, that wasn't in the affidavit. It was not, Your Honor. And the decision was simply made to include the information about the credit cards and leave out that information. And with regards to Mr. . . . Is there any reason to believe that had that information been included that there would have been a different result in connection with issuing or not issuing the warrant? Your Honor, I don't believe that there would have been a different result. I believe the search warrant still would have been issued. Could I ask you a policy question? I'm thinking about the ramifications of ruling in your favor on this issue, which basically would be to say that when police engage in an improper search, they can go and find stuff. They can then go and use information that they had, which would have enabled them to get a warrant all along and use that to get a warrant. It seems like there's no harm done. But I wonder, I mean, what if you have a police department that thinks it's kind of burdensome to go and get a warrant every time you have probable cause, and frequently when you go and get a warrant based on probable cause you don't come up with anything. So why don't we just have a policy of not bothering to get warrants and always just go and search, and when we actually find something one out of ten times, we then use the probable cause that we had all along to get a warrant. If that's the policy, it seems to me to be inconsistent with the warrant requirement because a lot of other people are getting searched without a warrant. Do you see what I'm asking? I absolutely understand your concern, Your Honor, and that's not the situation in this case. I know the hypothetical abusive rule is not the case, but I'm wondering if it could be the case if we rule in your favor on that issue. Your Honor, I don't believe so. What's the difference? Well, the difference is in this situation, Your Honor, the officers at this time did not believe that a search warrant was even required to search a cell phone, and that obviously has changed at this point. So there's sort of a good faith component to that? There is a good faith component to that, Your Honor. So at some point, using information you already had might not be enough to clear the taint? And that very well may be, Your Honor, and I think that that's completely distinguishable from the situation that Mr. Cave mentioned a moment ago about, let's say, officers break into a house, find evidence, and then say, oh, we got good stuff, let's go get a search warrant. That's simply not the case in this situation, and we would agree that that would be misconduct. That's breaking the law if you break into an individual's home simply to get evidence from their house. That's not the case here. You have a small police department that passes this off to the Secret Service. That's correct. And that's where the break comes in, right? Well, the breakdown actually occurred before that, Your Honor. That's what I mean. In other words, that's when the change of view of searching the cell phone takes place. Actually, it took place at the police department when the officers called for... No, I mean the change in the law enforcement view. The first law enforcement agency didn't seem too sensitive about this. The Secret Service told them, turn the phone off, we're going to get a search warrant. It actually wasn't the Secret Service. It was the Tennessee Highway Patrol. When they called in Agent Kimbrough to come in and assist them with the investigation of the cards and swapping of the mag stripes, that's when they said, let's stop, power down the phones, and get a search warrant for the phones. So they had that conversation. And, again, at that time, there was not a clear point of view as to whether or not a search warrant was required to search a cell phone. And, certainly, as we conceded in our brief, certainly that first search was unconstitutional now based upon the Supreme Court's ruling in Raleigh and Horry. Are there precedents which support the idea that you can cure an improper search this way just by using clean information, as it were, to get a warrant later and then executing the warrant? Or let me ask you this. What's the best case that supports that? This can't be the first time this ever happened. Maybe it is. I don't know. Your Honor, I do not have any factual or, I'm sorry, any case law to back that up today, but I'm happy to supply additional support if you'd like that. Well, if you come up with something on point, that'd be great. There are a lot of cases that say that we can even excise information that's in the affidavit and see if the affidavit is still sufficient once you've excised information you put in there. It seems to me that's a pretty close analogy. It would be, yes. Well, there's case law, too, that says, for example, if the police were to seize a car on the spot and then later get a search warrant before they search it, the seizure actually took place before the warrant. But that's an issue of whether there was probable cause for the initial seizure. Your argument is there was nothing derived from the initial search that may now be illegal that in any way affected the case, right? That's correct. I mean, it was not used in the search warrant affidavit, and it was not subsequently used. Now, certainly had we gone to trial, we would have used all the evidence that was obtained in this case from the search warrant. Isn't another way to look at this that this was an access device card case right from the very beginning when they found all these cards, particularly in the trunk? And, yeah, they looked at the cell phone, but that didn't change the nature of this case. On these hypotheticals, if you break into a house, you look around, and then you see a bunch of other stuff, your illegal conduct is substantially changing the nature of the case. Yes, it absolutely is. With regard to the issue of the mag stripes in this case, the United States believes that there is no reasonable expectation of privacy in a mag stripe. Specifically, we point to the fact that the Fourth Amendment secures against unreasonable search and seizures where there is a legitimate expectation of privacy. And there are several factors that have been enunciated to determine whether or not there is a reasonable expectation of privacy. Number one, if a person has an actual or subjective expectation of privacy and the individual's subjective expectation is one that society is prepared to recognize. Now, the expectation of privacy must be objectively reasonable under the circumstances, and here there is no objective or subjective expectation of privacy in a mag stripe because it's not a place that you expect sensitive information to be stored. The analogies that the defendant's attorneys have purported to support their positions are simply incongruous and unavailing. The first that they pointed to in their briefs was a camping tent. We certainly agree that it's long been recognized that a camping tent or any type of habitat, no matter its permanence or structure type, is recognized by the Fourth Amendment as a protected place and a person does have a reasonable expectation of privacy in those places. With regards to their other arguments that other forms of magnetic data are also similar, we again say that the forms that they have pointed to with regards to cassette tapes and VHS tapes, those are places where there is a reasonable expectation of privacy because you expect people to store data to be viewed and reviewed on those types of data. They are common forms of magnetic data. People commonly at least used to have VHS recorders in their homes or cassette decks in their cars, and they were able to access that information routinely to access things that were stored on that for their own personal use. With regards to the mag stripes, the only similarity is that they're magnetic forms of data. As your honors have pointed out already this morning, they are very limited in the quantity that can be stored on the mag stripes. It's limited to a series of numbers. Sometimes the individual's name is not even listed on the mag stripe. The amount of money that is available on that card may or may not be accessible. But one thing that I do want to point out is that— The amount of information roughly capable of being put on that type of strip comparable to the amount of information that could be printed on the front of the card? Could you re-ask that question, your honor? I'm just talking about the amount of information. I mean, you think of what they can put on microchips. They can put the Encyclopedia Britannica on a microchip these days, I suppose. So I'm hesitating trying to draw distinctions based on whether something is magnetic or not. I'm just trying to get at whether with the particular item you're talking about there's a great amount of information or a less amount of information. If you have a credit card-sized card and you're printing stuff on it, there's a physical limit to what you could put on there without having to get some big fancy machine to read it, right? I don't know, 50 sentences probably, depending on how good your eyes are. There's a comparable limit, I'm understanding, but this is what I'm asking, on one of these so-called mag stripes. Something that wouldn't necessarily be the case on some much more sophisticated kind of stripe, right? Is that accurate? Is my science accurate there? It is accurate, your honor. I mean, the capability of these stripes is extremely limited in that it's only- It's like it's hard to type a whole lot on a small piece of paper compared to a ream of paper.  Let me ask a follow-up question to that. I think because the defense counsel recognized that, we then started to hone in on what is included in this small universe of information. And I was sort of surprised that what they ended up focusing in on, both of them, is the dollar amount on the card. Because I didn't remember that to have ever been argued, and I just flipped through the briefs and I can't find it. If that is their key, well, you know how much money was on that card. Has that ever been a part of this case? That has never been a part of this case, and actually in the transcripts, Agent Allen's testimony is around page 208 of the suppression hearing transcript, and that's page ID around number 416. He testifies about what is actually on those cards, or on the MAC stripes, rather, and he testified that it's limited to the bank identification number, which is also printed on the front of the card, like American Express starts with the number 3. The bank identification number's on that stripe. The account number's on that stripe. The username may be on the stripe, and there's algorithms that are used to conduct the financial transaction. There's no information in the record that the actual amount of money that's loaded on that card is on the MAC stripe. In addition... Well, I guess I would have sort of assumed the amount of money is on there, and maybe that's what defense counsel is thinking too. So what you're saying is you take your card into a store, and let's just use it as a gift card. I would have thought they swipe it and the gift card tells how much money is on it, but you're saying, no, you swipe it, and then the computer then goes someplace else where the amount of money that's associated with that card is actually stored. It's not on the card itself. There's nothing in the record. There was no testimony during the suppression hearing about whether or not that information is stored on the MAC stripe. As I understand it... Well, that's an interesting additional complexion to this. Let's assume that they're right, that the amount of information is encoded on the card itself. Does that change this case? It does not. I think that Your Honor is correct that it would be akin to how much money is in your wallet. But I'll take it a step forward. Mr. Cove mentioned that how they spent that money is important. Well, how they spent that money is not accessible at all by swapping that card. In order for us to obtain that information, we have to send subpoenas to each of the financial institutions to determine what type of transactions occurred, where the money was spent, etc. That is referenced in the suppression hearing transcript. Agent Allen did testify about the fact that subpoenas were issued to each of these financial institutions in order to find out how the money was actually spent. So the concern that Mr. Cove raised about finding out how the money was used or where they were spending it, that's not a legitimate concern because that information is not accessible by swapping the card. It's limited. And the only way you can get it is through a... Correct. Correct, for us to contact the bank that issued the card in order to get a rundown of that account as to how the money was actually spent. So that's not a legitimate concern that the defendants have raised because we simply can't access that information without additional steps. So their correlation that these types of data are similar is simply unavailing because the mag stripe is not a place that society is prepared to recognize that one has a legitimate expectation of privacy in. These cards are issued by... Once you get the card. I'm sorry? No legitimate expectation of privacy once you have the card in the first place. Correct, in the mag stripe, absolutely not. And, in fact, the cards are issued by financial institutions and banks who actually own the cards, and the use of the cards is subject to the terms and conditions placed on them by the actual issuer of the card. So that being said, society is not prepared to recognize that there is a legitimate expectation of privacy in these mag stripes because, number one, it's not a place that you would expect to store data. They are totally different than the other forms of magnetic data referenced by the defendants. And, number three, they don't even really belong to the card holders themselves. They are owned by the banks and financial institutions. I don't really see how you get too far on that one because the cocaine the drug dealer is storing in his house is oftentimes owned by the supplier who fronted it to him. So are you going to get very far on that argument? Yeah, I understand your concern with that, but to think that one would expect to store sensitive information in something that's owned by another individual, I think, would be the argument with regards to that. So if we're looking at this from the broader, what do we do with mag stripes? There could be a distinction between information on a mag stripe on a card provided by somebody else, like a store, versus if the hypothetical we talked about, about you get your own mag stripe, a card that has mag stripes, and then you encode it because you want to be able to carry that around with your passwords and account numbers and all that kind of stuff. There could be a distinction whose card it was? I think that that would be a fact-specific case, and we'd have to look at the totality of the circumstances in that case as to whether or not there's a reasonable expectation of privacy in that. I don't know that society has really advanced to that point where people are storing passwords and other personal information on magnetic stripes. Actually, that's exactly what I just was reading an article the other day about instead of carrying around 10 cards in your wallet, put it all on one card and then have the merchant swipe that. Your frequent coffee account or whatever it is off of one card. That's where we're going, apparently. I can see that that could be a different situation. We'd certainly have to analyze that at that point, and I think that that's a totally different situation from what we have here with these limited cards. Counsel's reliance also on Raleigh, we believe, is inapplicable and distinguishable from these facts in this case. We agree that Raleigh does protect cell phones because, as the Supreme Court found in that case, cell phones hold copious amounts of information. There are huge minicomputers that store the sum total of a person's life these days. That's not the same with these magnetic stripes on a credit card. So we believe that that is a fundamentally flawed analogy and that their reliance upon Raleigh to this specific fact case with regards to magstripes is wholly inconsistent and unavailing. Your Honors, we believe that in this case that there is no reasonable expectation of privacy in the magstripes. We believe that for that reason that the district court's denial of the suppression motions was correct and that that decision should be affirmed. Unless there's any other questions, I appreciate your time this morning. Thank you, Counsel. Thank you all. Judge McKeegan, in response to your question about the upcoming magstripes that contain your frequent flyer numbers and your money amounts, that's where you get into Herring v. the United States and this forward-looking deterrent effect of the exclusionary rule is that you want officers in the future, when they come across a magstripe or some other digital form of data storage, to take a moment to slow down to submit their request to a detached and neutral magistrate. Is perhaps the answer to that, and I appreciate your views because you've thought about this a lot. How broadly or narrowly we issue rulings is always an important question, and it seems to me we need to be focusing on what's at hand here. These are not these magstripes of the future. These are just magstripes on gift cards and credit cards. That's all they are. That's all this case is. Is that a fair statement? Yes, Your Honor. We don't really have enough information to know what the world of magstripes is going to morph into tomorrow or five years from now. I don't think we have the factual basis in the record we have with this case, but you also have a case before Your Honors where the defendants have served their jail time, restitution has been paid, they were released from their judgment lien a few days ago. So the societal cost of a ruling protecting magstripes is very small, if negligible, but that the benefit and the warning to police in the future of, you know, we're going to look closely at any sort of digital data storage is immense in protecting people's Fourth Amendment rights to privacy concerns. Judge Rogers, in regard to your question about the magnifying glass, I'm allowed to wear my glasses and look at stuff. I can't see anything without them. A magnifying glass would probably be okay, but, for instance, an electron microscope or a regular microscope to try and read, you know, tiny little amounts of spy information in the dot of the eye on a card, I think that would be problematic because, again, you're getting into using a more technological instrument to access that data. You can collect DNA at a crime site now under your analogy, but you can't undergo a DNA test because that's a complicated scientific test that is a manipulation. Except in the course of DNA at a crime scene, you have abandoned it. It's just like if I took my credit cards and dumped them in a trash can. So the answer is no expectation of privacy because you abandoned it. Correct.  Well, I know that if I get arrested, you're going to go through it, at very least and count it in front of me to make sure that I don't later say you stole some of my cash. With a gift card or a credit card, I have the advantage of, you can't tell how much cash I have just by looking at the card. You're going to have to do something more to find out how much cash I have. And on that point, I can't find anything in any of the briefings about how the problem here on the information, on the limited information on these cards is the amount of money, which is what this argument seems to have devolved down to. I realize, Your Honor, we did not bring that up in briefing. It has come up in oral argument. I still maintain, though, that the cardholder name versus the payer name, for instance, the agent's name on the front of the card but United States on the back, my name on the front of the card but my sugar daddy's name on the back, that's a private thing as well. I have a concern about how the law develops. It seems like ratcheting when you say, well, you can look at what's on a card but then the defendant starts saying, we've got to be realistic. A whole lot of stuff can be on the card, so let's be realistic. Then when you get a case which says, yeah, let's be realistic. A whole lot of stuff can be in a cell phone. Then they say, oh, now we want a categorical rule that even applies when there's not a whole lot of information on it. It seems like a ratchet against the ability to use sort of common ways of viewing things that you legitimately have a hold of. That's sort of an abstract concern, but it seems like what's going on. See what I'm saying? Right. We have an evolving definition of what personal effects are that are protected by the Fourth Amendment. Should it be real realistic so that we look exactly at what's going on or should we have categories? It seems to me if you just have all these bright line categories, it's going to devolve eventually to the detriment of privacy rather than looking at things kind of realistically. If you break it down, though, for law enforcement to know how many bytes of data can be on something, I think you're going to give them an untenable judgment of, well, is this the type of mag stripe that has this many bits of data or is it the one that IBM developed that can have billions? The answer is going to end up being if it's a card, you can do anything you want with it. You're saying, no, if it's magnetic, you can't do anything at all with it. Either way, there's problems, I suppose. If it's a home, you can't do anything with it without a warrant. If it's digital data storage, you need a warrant. I think the interesting part of your argument is as we've gone into the fanciful world of mag stripes and where technology might go, a lot of these arguments you're making in the facts of this particular case, once we get into, well, geez, it's got the store name and the number, the dollar amount and where I shopped and everything, you can't win as far as your client goes on those arguments under Leon, it seems to me. So the best that you could do is you're now really standing up here arguing on behalf of all the other access device crooks in the world that don't search their stripes. Leon concerns a police officer's reliance on a warrant issued by a neutral and detached magistrate. What we have in this case is an unknown conversation between one agent and an assistant U.S. attorney. We still have a good faith test. It's a good faith test, but we don't know what information they're relying on. And parallel with a lobby where we have a case here where you don't have an encoder in the car, you don't have a ream of paper with people's names and credit card numbers, all you have is a stack of 68 gift cards, some of which you've taken out of people's wallets, out of the glove compartment, that when all you have is that, maybe you shouldn't be allowed to just start swiping them to see what's on them. But in a lobby, if you have the encoder, if you have information for using stolen credit card numbers, or, for instance, if you're caught at a Walmart trying to use the card where you've swiped it and the security descends upon you, that's a different situation than we have here with Mr. Ba, where he's driving down the street, it turns out his license is expired, or suspended, excuse me, and oh gosh, you have a lot of cards, let's run them through a reader. And I think that's where you have the affront that goes beyond a good faith reason to think you can look at them. Thank you. Mr. Cave, you have rebuttal. Yes, Your Honor. Briefly regarding the dollar amount that was on the gift cards, I think we may be talking about apples and oranges. Agent Kimbrough spoke specifically about what was found on the mag stripes once they were swiped. On page ID 349, when they interviewed with Tracy Bowman, the question was, did you prepare any report or document concerning your actions in trying to determine whether or not there was money on these gift cards? And he stated, when Mr. Kimbrough showed up from the state, he had a device where he could scan them to see if there was anything on them. So it's more about what was objectively found may be different than what they were subjectively looking for. When the search was performed, they were looking for money on the cards. I was simply looking for an argument in the briefs that the fact that there may be money on the cards is something that makes this worthy of an expectation of privacy. It is something I noted as I was looking through the transcript a couple of nights ago. I apologize, Your Honor. There was one other thing I wanted to mention briefly. The new case, Rodriguez v. The United States. My client was a passenger in this case. If you look at the video document 18, by 1556, there had already been a search of the inside of the vehicle. The Mamadou Ball had already been arrested, put into the back of the car. They had patted down my client. At this time, there was no reasonable suspicion to pursue any kind of further search against my client. They had not yet searched the trunk. The only thing they had found were four gift cards, completely unremarkable, within the glove compartment. First of all, you didn't raise that in your opening oral argument. Is that correct? You're on one of what your opposing counsel called arguments one or two. Is that right? Yes. The government did briefly mention it at the beginning of their... It's kind of a small turning point. In any event, is there a question as to whether your client has standing to raise this? The question would be whether he was illegally detained at the moment that the purpose of the traffic stop had ended, and they had him remain there to, I guess, watch an inventory search under seizure when he could have just taken his bag. Did your client lack standing to raise this argument? No, Your Honor. What you're omitting in your argument is the furtive movements of your client that looked like he was trying to secrete something, and then you find four gift cards that ultimately turned out not to be properly encoded in the glove box. So you've got to get by the combination of those two to at least allow further... and that further investigation produces 68 more cards in the trunk. Well, my argument would be at the time they had furtive movements, I think that was alleviated by the time they had padded Mr. Harvey down and they had searched the inside of the vehicle, they knew there were no weapons. At that time, without the furtive... The search of the vehicle inside is the glove box, and they didn't find a weapon, but they did find these credit cards. So in an investigative search, you have to convince us that that doesn't allow them then to take further steps, which in this case revealed 68 more cards. But there was nothing on those four gift cards to give any kind of reasonable suspicion that there was a problem. But from a pure police officer, the question is, why were you furtively sticking those cards into the glove box in their mind if they're innocent? Well, that's not in evidence. As a matter of fact, he said specifically on the audio several times, there's got to be drugs in this car. He said nothing about thinking that those cards were remarkable. That's not the fact that there were four cards that he thought he had stuffed them in. You're really making a pretext argument, and you're not going to win that. I just think we're providing... The fact that you're looking for a gun or you're looking for drugs, and then you find that the product of these furtive movements happened to have been secreting cards still, it seems to me, gives you the right to continue your investigation. I guess my argument would be it would be impossible for him to have known that those four cards were the product of his furtive movement. He didn't know. That's true. That's the whole point of the search. If you knew what the reason for the furtive movement was, you wouldn't do a further search. Well, he thought there were drugs in the car,  illegal access devices, Your Honor. Okay. Thank you, Counsel. Thank you. The case will be submitted. Mr. Cave, I see that you were appointed under the Criminal Justice Act. We appreciate your service under the Criminal Justice Act. We appreciate the arguments of all the counsel today.